**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

JOHN W. LINDSTROM,

        Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.

No. C 09-3053-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

———————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.* **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.* **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *1.* *Lindstrom's hearing testimony* . . . . . . . . . . . . . . . . . . . 5
        *2.* *Lindstrom's medical history* . . . . . . . . . . . . . . . . . . . . 10
        *3.* *Medical experts' testimony* . . . . . . . . . . . . . . . . . . . . 27
        *4.* *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . 31
        *5.* *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . 34

*II.* **LEGAL STANDARDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*III.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    *A.* **Lindstrom's Objection** . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    *B.* **Discussion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    *C.* **Report and Recommendation** . . . . . . . . . . . . . . . . . . . . . . . 47

*IV.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# I. INTRODUCTION

## A. Procedural Background

This case is before the court, once again, pursuant to a Report and Recommendation from Chief United States Magistrate Judge Paul Zoss regarding a claim for Social Security disability benefits. 2010 Report and Recommendation, (Docket no. 18, No. C09-3053-MWB). I will use my findings from a prior remand decision, Order Regarding Magistrate Judge's Report and Recommendation, September 29, 2008, (Docket no. 12, No. C07-3050-MWB), to introduce the procedural history.

> On November 12, 2003, plaintiff John Lindstrom protectively filed an application for disability benefits under the Social Security Disability Insurance program. This application was denied initially and on reconsideration. Lindstrom then requested and was provided a hearing on September 8, 2005. At this hearing, the Administrative Law Judge (ALJ) ruled against Lindstrom, finding that he was not disabled absent his alcoholism. Lindstrom appealed the ruling to the Appeals Council, which found on March 23, 2006 that his case should be remanded for another hearing in front of an ALJ. On August 15, 2006, Lindstrom was provided with another hearing, and, again, it was found that Lindstrom was not disabled. Lindstrom again appealed the unfavorable decision to the Appeals Council, but this time it denied his request for review. As a result, the ALJ's decision was a final decision of the Commissioner of Social Security.
>
> On July 25, 2007, Lindstrom filed a complaint in this court seeking review of the Commissioner's final decision denying him benefits. Doc. No. 1. The undersigned referred the matter to Chief United States Magistrate Judge Paul A. Zoss for a report and recommendation. Both parties filed briefs in support of their positions (Docket Nos. 7 and 8) and Lindstrom waived his right to file a reply brief. Doc. No. 9. On August 18, 2008, Judge Zoss issued his report and recommendation. Doc. No. 11. In his report and

recommendation, Judge Zoss notes that "Lindstrom has offered no evidence to prove he became disabled as of" September 17, 2002 and that the first medical evidence of record is from August 2003, and he recommends remanding the case due to the following findings: first, that the record was not fully and fairly developed due to the ALJ's failure to obtain and properly consider the VA's disability determination; second, the ALJ erred in failing to obtain a "comprehensive psychological evaluation," which would allow recognition of Lindstrom's employment abilities; and third, the ALJ did not properly evaluate Lindstrom's credibility by failing to affirmatively refute Lindstrom's claims. *Id.* Neither Lindstrom nor the Commissioner filed objections to Judge Zoss's report and recommendation.

2008 Order Regarding Magistrate Judge's Report and Recommendation, pp. 1-2 (Docket no. 12, No. C07-3050-MWB). On September 29, 2008, I adopted Judge Zoss's Report and Recommendation. *Id.* The subsequent procedural history is summarized by Judge Zoss in his Report and Recommendation which is currently before me:

Judge Bennett remanded the case, finding that the ALJ had erred in failing to consider properly the VA's disability determination. He further found that in connection with the ALJ's determination of Lindstrom's residual functional capacity ("RFC"), the ALJ erred in failing to obtain a psychological evaluation to make a full determination of Lindstrom's employment-related abilities. He required the ALJ, on remand, to provide a "sufficient explanation of his or her credibility assessment as to assure reviewing courts that it was not formed 'solely on the basis of personal observations.'" *Id.*, p. 9 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). Judge Bennett remanded the case to give the Commissioner "a chance to further develop the record, obtain sufficient evidence, and conduct a proper credibility analysis of the claimant's statements." *Id.*, p. 10.

Pursuant to Judge Bennett's order, on October 27, 2008, the Appeals Council remanded the case for a supplemental hearing. (R. 516) The hearing was held on March 5, 2009. (R. 658-76) On June 2, 2009, the ALJ issued his opinion, again denying Lindstrom's request for benefits. (R. 467-77) Lindstrom did not file objections to the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Lindstrom filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. Doc. No. 1. In accordance with Administrative Order #1447, dated September 20, 1999, this matter again was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Lindstrom filed a brief supporting his claim on March 16, 2010. Doc. No. 12.

The Commissioner filed a responsive brief on June 24, 2010. Doc. No. 16. In the brief, the Commissioner asks the court to remand the case once again because upon review, it does not appear the ALJ obtained and considered the VA's disability determination as ordered by the court previously, nor did the ALJ provide an adequate explanation of how he had complied with the court's remand order. Doc. No. 16, p. 7. The Commissioner suggests that upon remand, an ALJ will be directed to obtain the VA's disability determination, if possible, or to explain efforts made in that regard if the report cannot be obtained. In addition, the ALJ will make a complete evaluation of Lindstrom's credibility pursuant to the applicable regulations and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and offer Lindstrom the opportunity for another hearing. Doc. No. 16, pp. 7-8. The Commissioner specifically acknowledges the ALJ's decision does not contain sufficient explanation, but argues that the "passage of time alone . . . is not a sufficient legal reason to award benefits to a claimant." *Id.*, p. 11 (citations omitted). The Commissioner argues remand is appropriate because the Record does not contain "overwhelming" evidence to support an immediate finding of disability. *Id.*, pp. 8-12 (citing, inter alia, *Buckner*

4

> *v. Apfel*, 213, F.3d 1006, 1011 (8th Cir. 2000) (immediate
> award of benefits is appropriate only where the Record
> overwhelmingly supports an immediate finding of disability)).
>
> Lindstrom disagrees, arguing the facts have been
> developed fully, and the Record overwhelmingly supports an
> immediate finding of disability. Doc. No. 12, pp. 26-27.

2010 Report and Recommendation, pp. 2-3 (Docket no. 18, No. C09-3053-MWB).

After reviewing the ALJ's decision, Judge Zoss held that "the Record does not contain substantial evidence to support the determination that Lindstrom's substance abuse disorder is a material contributing factor in the disability determination." 2010 Report and Recommendation, p. 38 (Docket no. 18, No. C09-3053-MWB). Nevertheless, Judge Zoss ultimately held that "the Record does not 'overwhelmingly support' an immediate finding of disability." *Id.*; quoting *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). Judge Zoss recommended that this case be remanded for further proceedings, because the ALJ had failed to comply with the court's prior remand order in three areas: (1) the ALJ "failed to obtain a comprehensive consultative psychological evaluation to support his [Residual Functional Capacity] determination" *Id.* at 37; (2) the ALJ failed to "obtain and properly consider the VA's disability determination" *Id.*; and, (3) the ALJ failed to "fully explain his credibility assessment to 'assure reviewing courts that it was not formed 'solely on the basis of personal observations.'" *Id.* The court will review the relevant portions of Judge Zoss's decision that Lindstrom has objected to *de novo* and Judge Zoss's remaining findings for clear error.

### B. Factual Background

### 1. Lindstrom's hearing testimony

In Judge Zoss's 2010 Report and Recommendation, the following findings of fact were made concerning Lindstrom's hearing testimony:

## a. September 8, 2005, hearing

At the time of the hearing, Lindstrom was living alone in an apartment in Kamrar, Iowa. He was born in 1953, making him fifty-two years old at the time of this first hearing. He quit high school during his senior year, and got a G.E.D. He served in the Navy from 1972 to 1973, presumably working as a Boatswain's mate. FN1/ (R. 399)

> FN1/ The transcriptionist listed the job as "Boltsman [phonetic] mate." (R. 399)

Most of Lindstrom's work experience has been spent doing factory, maintenance, and labor types of work. He last worked in September 2002. He is "on a 100% non-service connected VA disability," which began in approximately November 2003. (R. 400) He receives $848 per month in VA disability payments. (*Id*.)

Lindstrom stated his primary disabling condition is related to his mental health. He gets anxiety or panic attacks during which he feels like he is going to pass out, and he feels weak and begins to shake, both inside and outside. (R. 401-02) Being around people can precipitate such attacks, so he spends most of his time alone. He estimated he has a panic attack about once a month. (R. 402-03) Each panic attack lasts ten to fifteen minutes. After the panic attack ends, he feels weak and drained, and he has to lie down or sit and rest for the remainder of the day. (R. 404)

Lindstrom used to live at the YMCA, and he would only leave his room to eat or use the restroom. He now lives alone in an apartment, and he leaves home very seldom. He goes shopping for groceries once a week, and he visits his sister, who lives about ten minutes away, for about half an hour twice a week. Otherwise, he stays home. (R. 405) He has no friends and is unable to maintain relationships. When he used to be around people and try to date women, he always ended up becoming verbally abusive, and he frequently got into physical altercations. (R. 406-07)

Lindstrom also has problems with his mind racing, and paranoid thoughts that others are talking about him. He plays video games to keep himself from thinking about things. He tends to upset himself, which makes his stomach tighten up and hurt. Because his mind races, he has problems with concentration and memory. (R. 407-09) Although he believes he has a high energy level, he lacks motivation to do anything and spends most of his time just sitting. (R. 409-10) He does not have suicidal thoughts, but he has had homicidal thoughts at times, especially when he was over-medicated. (R. 410) He believes his mental condition would prevent him from completing a normal eight-hour workday. (R. 411)

**b. August 15, 2006, hearing**

At the beginning of the hearing, the ALJ reviewed Lindstrom's past relevant work as set forth by the VE. (See R. 205-06) Lindstrom's past jobs include maintenance engineer, forklift operator, small products assembler, heat treater, mixer operator, hog sticker, and chipper grinder. The VE also listed "injection molder," but Lindstrom clarified that he did not run an injection mold; rather, he inspected parts after they came out of the mold. (R. 431-33) However, he indicated his last job, which ended in September 2002, was "doing molding, making table counters." (R. 437) The job ended after Lindstrom threatened his supervisor. He received unemployment compensation for six or eight months after he quit working. (R. 441)

Lindstrom stopped drinking alcohol five months prior to the hearing. He quit using marijuana about a month prior to the hearing. Before then, he was using marijuana every day, and drinking almost every day. (R. 438-39)

Lindstrom's anxiety attacks apparently had increased in frequency and intensity since his first ALJ hearing. At this hearing, he stated he had anxiety attacks three to four times a week, and the attacks lasted longer and were more intense than they were when he was still using alcohol and marijuana. When he has an anxiety attack, he experiences "uncontrolled

7

shaking," and he feels light-headed and like he is going to pass out. (R. 441-42)

Lindstrom has problems dealing with people. He gets very angry, shakes, and yells. He has a nephew, Josh, who is "the only one who really comes around and sees [him]," because Josh understands that despite how angry Lindstrom appears to be, Lindstrom will not hit him. According to Lindstrom, outsiders observing his behavior would think he was going to kill someone. (R. 442-43) He is taking medication that helps keep his mind from racing, but he still becomes angry quickly at anyone who is around him. He believes he cannot work, in part, because he is "afraid [he is] going to hurt someone." (R. 449) To control his environment, he stays at home, only going out for groceries, to check the mail, and to see doctors at the VA. (R. 445-47) He stated his hygiene is poor, and he sometimes goes several days without showering or shaving. (R. 447)

Lindstrom stated he has difficulty concentrating, and his medication affects his concentration and gives him "cotton mouth." (R. 448-49) The medication leaves him "tired and forgetful." (R. 450) He stated he would be unable to perform any type of work because his medication prevents him from remaining focused. (R. 451) He often thinks people are plotting against him, and he has problems communicating with others. He stated, "I wouldn't even want to work with me." (R. 452)

2010 Report and Recommendation, pp. 4-6 (Docket no. 18, No. C09-3053-MWB). Judge

Zoss also found that:

At the third hearing, witnesses included Lindstrom; medical expert Dan Rogers, Ph.D.; and Vocational Expert Melinda Stahr. At the start of the hearing, the following colloquy took place between the ALJ and Lindstrom's attorney:

ALJ: Okay. Mr. Krause, I would note your claimant is now 56 years old. His date last insured is December of '07. I would note there is a big break in treatment between '04 and '06, but starting in July of '06 he has very low GAF's. If you would like to amend to July of '06, we might be able to find him disabled from that date. I'll let you talk with your claimant about that off the record.

ATTY: Well, Your Honor, I've already talked to the claimant. The current onset date is October of 2002, and I tried to obtain additional medical records from the VA. They don't have any prior to August of '03. We would be willing to amend the onset date to August of '03, and I have Dr. Rogers here to testify specifically regarding the claimant's abilities, and also the propriety of the August of 2003 onset date.

ALJ: Okay. So July of '06 is not something you would be willing to agree to?

ATTY: Correct, Your Honor. And I think that that would be inconsistent with the Court's order which requires testimony, or evidence from an examining professional regarding the claimant's work-related abilities. That would specifically identify '06 as the onset date, or the date in the change of the claimant's condition. Dr. Rogers'[s] testimony, I believe, would be generally that the claimant has an organic brain disorder. The report was faxed to you yesterday, and that it is not due to drug or alcohol addiction. Drug and/or alcohol addiction is not currently a problem. The treatment would not really be successful. So the fact that there

was no treatment would not be any reason to
deny that. (R. 660-61)

Lindstrom testified briefly at the hearing. He stated he
had not worked for pay or profit since his last hearing in 2005.
In August 2003, he was hospitalized at the VA Hospital in Des
Moines, Iowa, and Knoxville, Tennessee, for six months, and
he has not worked since that time. His employment history
includes work at IBP in 1983; work as a heat treater from
1985 or 1986, until 1988 or 1989; and as a maintenance
engineer at some point prior to his date last insured. (R.
671-72)

According to Lindstrom, he has been ruled 100%
disabled by the Veterans Administration. He described his
disabling condition as "anxiety attacks, and my functioning. I
didn't get along with people." (R. 672) He initially stated he
last used alcohol or other drugs in 2004, but when confronted
with VA records that appeared to contradict his statement, he
explained that he has "had a beer but that's it." (R. 673) He
also stated he "smoked marijuana for three days, 10/22/06 for
three days until [he] got [his] medication." (*Id*.) He has not
smoked any other marijuana since that time. (*Id*.)

2010 Report and Recommendation, pp. 6-8 (Docket no. 18, No. C09-3053-MWB).

## 2. *Lindstrom's medical history*

Regarding Lindstrom's medical history, the court will adopt Judge Zoss's findings

in his 2008 Report and Recommendation:

On August 4, 2003, Lindstrom was seen at the Veterans
Administration's Central Iowa Health Care System in Des
Moines, Iowa, requesting medical clearance to enter a
substance abuse treatment program. He reported using alcohol
and marijuana the previous day. He was found medically
stable for outpatient detox. (R. 336-38) On August 6, 2003,
he was admitted into a residential treatment program.
Admission notes indicate Lindstrom was homeless and
unemployed, he was self-referred, and he had no family or

10

other significant individual willing to participate in his treatment. He indicated he had been through substance abuse treatment three times previously, in 1974, 1981, and 1990. (R. 330, 334-35) He told the staff he had "a real bad alcohol and marijuana [problem]." (R. 334) He also reported using methamphetamine in the past, most recently seven months earlier. (R. 331) He described several arrests and legal problems relating to his substance abuse, and stated he had spent several years in prison. (R. 323) He complained of problems getting along with others, and "trouble controlling violent behavior." (R. 324)

Lindstrom was treated with medications, and was started on an exercise program for general conditioning. On September 4-5, 2003, he was noted to be having problems with aggression, impulsivity, and controlling his temper. His medications were adjusted. (R. 314-15) He continued to have difficulties controlling "his hostile actions and his inability to let go of issues that are not in his control." (R. 309) He was depressed but not suicidal, and stated 'he was ready to go off on staff if they [did not] leave him alone.' (R. 309) He felt the staff had disrespected him and could not be trusted. The counselor's notes indicate Lindstrom "displayed no ability to internalize what is said to him or accept any responsibility for control of his actions." (*Id.*) Lindstrom agreed to a mental health referral for depression. (R. 307) On September 15, 2003, Lindstrom was seen for a psychiatric consultation and evaluation by David L. Bethel, D.O. (R. 299-304) Lindstrom described himself as a "child drunk," and stated he had experienced problems with his temper dating back to childhood. A mental status examination revealed that Lindstrom needed to shave, and he talked at an overly loud volume. Otherwise, his examination was within normal limits. (R. 301-02) Anger management classes were recommended, and his current psychotropic medications (Depakote, Buspar, and Trazodone) were continued without change. (R. 303) He was not considered to be a danger to himself or others. (R. 306)

Lindstrom apparently was admitted to the VA medical center on October 2, 2003, for treatment of alcohol dependence, with history of polysubstance abuse and alcohol induced mood disorder, and to rule out intermittent explosive disorder. (R. 296) On October 6, 2003, he was discharged from acute care and transferred to a residential facility for continued treatment. (*Id*.) At the time of his transfer, David A. Orea, M.D. opined Lindstrom was "unable to pursue gainful employment and . . . currently unable to provide adequately for [him]self in the community." (*Id*.)

On November 10, 2003, Lindstrom requested discharge from the treatment program. He planned to work in his home community of Kamrar, Iowa, and to live with his sister until he could get HUD housing. He had made good progress during treatment in dealing with his anger and stress, and he expressed an understanding that he should not consume alcohol or other drugs, legal or illegal, that could interfere with his improvement and be detrimental to his health. (R. 294-95) Upon discharge, his medications were Buspirone HCL, an anti-anxiety medication, 20 mg three times daily; Clonazepam, used to treat anxiety and panic disorders, 10 mg once daily; Clonidine HCL, a blood pressure medication, .2 mg once daily; Clotrimazole cream, used to treat certain skin conditions and rashes, among other things; Depakote, used to treat bipolar disorder, 500 mg twice daily; ibuprofen, an anti-inflammatory analgesic, 600 mg three times daily as needed for aches and pains; pseudoephedrine HCL, 30 mg four times daily as needed for congestion; and Seroquel, also used to treat bipolar disorder, 100 mg four times daily. FN2/ (R. 292) The doctor's discharge summary indicates Lindstrom had "reached maximum improvement possible [and] his Alcohol Induced Mood Disorder [had] stabilized sufficiently to permit outpatient treatment." (R. 290) Lindstrom was noted to have complied well with his overall treatment plan and medication regimen, and his mental status examination was within normal limits in all criteria. (R. 290-91)

FN2/ Information on prescribed medications is available at www.rxlist.com

Lindstrom was seen for outpatient followup on November 17, 2003. He was "upset" because he thought the appointment time was for him to see a doctor instead of a nurse. He reported sleeping poorly, and remaining inactive. He denied feeling depressed or suicidal, and stated he had maintained his medication regimen since his discharge from residential treatment. (R. 279) His medications were continued, and he was scheduled for followup in three months. (R. 279-83) A nurse attempted to reach Lindstrom on November 18, 2003, for followup on how he was doing, but he could not be reached. (R. 278) In a phone call on December 1, 2003, Lindstrom reported he was still unemployed, and he was planning to return to the Des Moines area to try to obtain employment because the small community of Kamrar offered limited employment opportunities. He had relapsed and used alcohol the previous week and did not have any interactions with an AA sponsor. He stated, "That's another reason I need to return to the Des Moines area. I need to get into AA and really get involved." (R. 277)

On December 16, 2003, Lindstrom was seen in the emergency room with complaints of nausea and diarrhea after reportedly eating some unrefrigerated pork hotdogs. He was staying at a YMCA. He was treated with IV fluids and was discharged from the ER in stable condition. (R. 253)

On January 9, 2004, Lindstrom was seen in the emergency room with complaints of pain from his shoulders down to his elbows bilaterally for eight days. He reported the pain would increase with activity and when he slept at night. He could not recall doing anything strenuous that would have caused the pain, but "wonder[ed] if he may have slipped and [fallen]." (R. 247) He was treated with an injection of Toradol, and was discharged in stable condition. (R. 248) He reportedly was unemployed and living in Des Moines. Besides his shoulder pain, he felt "fine." (R. 247)

13

Lindstrom was seen on January 15, 2004, for followup of his bilateral shoulder pain. Notes indicate his diagnosis was probable bursitis. He still had pain in both shoulders, but the pain was getting better. Lindstrom's current medications were continued, including 600 mg of ibuprofen three times daily as needed for pain. In giving his history, Lindstrom reported drinking four beers on New Year's Day. He stated his mood was "pretty even," with no suicidal ideation. (R. 242-46)

On January 20, 2004, DDS consultant Carole Davis Kazmierski, Ph.D. reviewed the record and completed two Mental Residual Functional Capacity Assessment forms regarding Lindstrom - one to indicate his abilities while he is drinking and using other substances (R. 207-10), and one to indicate his abilities while his substance abuse is in remission (R. 212-14). Dr. Kazmierski evaluated Lindstrom under Listings 12.04, Affective Disorders; 12.08, Personality Disorders; and 12.09, Substance Addiction Disorders. She noted Lindstrom's mental status evaluation "showed problems with anger control, but other aspects of mental status functioning were generally within normal limits." (R. 211) She concluded that although Lindstrom "does have some moderate restrictions in social functioning related to his personality disorder and problems with anger management," he is able to tolerate "brief, superficial dealings with others when it is in his own interests to do so," and "[o]ther aspects of work-related functioning do not appear to be significantly impaired when [he] is sober and abstinent." (R. 211) Another DDS consultant reviewed the record on March 1, 2004, and concurred in Dr. Kazmierski's conclusions. (R. 214) Another medical consultant reviewed the record on March 30, 2004, and concurred, as well. (R. 240-44)

Lindstrom was evaluated by a physical therapist on February 20, 2004, and physical therapy treatment was scheduled for his shoulders. Lindstrom reported that his pain was along the lateral shoulders, radiating to the elbow. It was worse with arm elevation and when he slept. Physical therapy sessions were scheduled twice weekly, and he was instructed

in home exercises. (R. 389-91) Lindstrom was seen on February 27, 2004, for a nutritional evaluation and education session. He was noted to be "motivated to make some changes in food choices, portion sizes and exercise routine to promote improved lipids." (R. 388) He stated he would begin walking regularly and attempt to change his eating habits. (R. 389) Lindstrom attended his physical therapy sessions and took his medications as directed. At a general medical followup appointment on March 12, 2004, he stated he was "doing well but [was] troubled by arthritis in shoulders. Doing well emotionally." (R. 378) On June 4, 2004, Lindstrom reported that he felt good except for ongoing pain in his shoulders. (R. 369)

On June 4, 2004, Lindstrom met with a social worker through a VA program for homeless veterans. He reported feeling trapped and isolated at the YMCA. He stated he had purchased a vehicle recently, and he planned to relocate to Webster City, Iowa, "and live in his car." (R. 368) On June 9, 2004, the social worker met with Lindstrom in Webster City and assisted him in locating housing. The social worker noted Lindstrom "displayed positive social skills and interacted well with individuals within the community." (*Id*.) On June 8, 2004, Lindstrom apparently moved back in with his sister in Kamrar, Iowa. (R. 364) Notes indicate he was "not depressed," had "good animation," and was not using drugs. He continued to complain of some arthritis pain in his shoulders. (R. 364)

On June 18, 2004, Lindstrom was given a depression screening test that was positive. He agreed to accept a mental health referral for depression. (R. 367) Lindstrom was seen in the mental health service on September 22, 2004. He reported that a month earlier, due to lethargy, he had stopped taking all of his medications except Seroquel. He stated he was "tense." Long-term goals of his treatment were to level his mood, increase his productivity and activities, and develop more tolerance of pain. (R. 360-62) He stated he was depressed at times, but he did not have mood swings. (R. 359)

He was assessed with a substance-induced mood disorder and alcohol dependence, mood disorder due to medical problem, antisocial personality disorder, and arthritis in shoulders. His Global Assessment of Functioning (GAF) was 45. FN3/ (R.359-60)

> FN3/ A Global Assessment of Functioning ("GAF") of 45 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Commissioner of Social Security*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).

On November 7, 2004, Lindstrom underwent an eight hour battery of neuropsychological testing and evaluation by David F. Dettmann, Ph.D., Neuropsychologist. (R. 353-57) Lindstrom indicated he was unemployed. He stated his general health was good and he had no significant health problems. He gave a history of depression and mood problems since at least age fourteen, stating he often was "hyped and depressed, with my mind racing, I'm always doing stuff." (R. 354) He described difficulties with his short-term and long-term memory. Lindstrom's test results were considered valid. He was cooperative, chatty, appropriately groomed, and exhibited a normal rate of mentation. "Psychomotor functioning was grossly normal, although somewhat clumsy and relatively inefficient for dominant right hand." (R. 355) His affect was appropriate and his speech was fluent and adequately articulated. "Abilities were generally good for a variety of structured and unstructured tasks. Self-monitoring and correcting abilities were good." (*Id.*) Dr. Dettmann's impressions after evaluating all of the testing were as follows:

16

Present neuropsychological data is consistent with a mild dementia due to persisting alcohol abuse. The difficulties noted in visual memory and learning, visual perception and visual constructional abilities, as well as in his reduced ability for visual construction and initial immediate detailed verbal memory, as well as reduced ability in understanding logical sequences of behavior, are consistent with the documented substance abuse. Mr. Lindstrom has adequate neurocognitive resources for competency needs and vocational activity if his substance abuse is managed. He has adequate ability to benefit from therapy and treatment programs using verbal modalities, but may at times have some rather unusual perspectives or solutions. He was responsive to general consequences and feedback, and has the ability to benefit from abstract concepts such as metaphors, analogies and proverbs, although may need some guidance and assistance. He appears to learn with repetition of information; however, given his difficulties with visual information, he should be encouraged to verbally describe and encode visually presented materials. (R. 357)

Lindstrom failed to appear for a mental health clinic appointment on January 21, 2005. He called the clinic on March 15, 2005, to report that he had been having problems with his back for two weeks, but nurses were unable to reach him to return his call. He failed to keep another appointment on April 15, 2005. (R. 352-53)

2008 Report and Recommendation, pp. 5-11(Docket no. 11, No. C07-3050-MWB).

In Judge Zoss's 2010 Report and Recommendation, the following findings of fact were found concerning Lindstrom's medical history since the September 8, 2005, administrative hearing.

> On July 18, 2006, Lindstrom saw Sally Watson, A.R.N.P. at the VA Medical Center in Des Moines, asking "to get back on some meds." (R. 625) He indicated he had been "self medicating . . . for anxiety with marijuana," with daily use for the previous eighteen months, and it was "starting to hurt [his] chest." (R. 625-26) He had stopped using marijuana recently because he wanted to be around his family, noting his anger management problems had caused people to stay away from him. (R. 625, 629) He reported having panic episodes frequently, often several times a week. He declined a prescription for lithium. (R. 629) Nurse Watson made the following initial DSM-IV diagnosis:
> > Axis I Clinical Disorder:
> > > Anxiety Disorder: generalized anxiety disorder, panic
> > > Addictive Disorder: Cannabis abuse, Sedative/Hypnotic
> > > Bipolar Disorder: Mixed
> > > Mood Disorder: [rule out] Substance-induced
> > > [History of] alcohol dependence, [History of] sedative abuse
> > Axis II Personality Disorders/Traits: narcissistic personality traits, by [history] [and] Adult Antisocial Disorder
> > Axis III Current Medical Conditions: hyperlipidemia, HTN
> > Axis IV Current Psychosocial Stressors: lacks primary support group, limited financial [NEBRASKA SUPREME COURT pension], other appealing rejection per Social Security Disability. Lives Section 8 housing

Axis V GAF Score (current level of functioning): 45 (*Id.*)

Nurse Watson noted Lindstrom was not considered to be a high risk patient. She recommended "use of 'traditional' mood stabilizer," with a retrial of quetiapine, 25 mg three times daily as needed for anxiety, titrating up to 100 mg at bedtime "for mood stability and anger management per [patient] report 2 months[.]" (*Id.*) She noted the anticipated duration of Lindstrom's condition and treatment to be "Chronic/Ongoing." (*Id.*) Lindstrom returned for followup on September 19, 2006. (R. 621-25) He stated he was using up to 50 mg of quetiapine four times daily, and 100 mg at bedtime, and he had noticed his mind was no longer racing. His appetite was increased but he was only eating one meal a day. He was advised to eat three small meals daily, get regular exercise, and avoid daytime naps. (R. 621) His diagnoses were listed as generalized anxiety disorder, panic; Cannabis abuse, Sedative/Hypnotic; Bipolar Disorder: Mixed; rule out substance-induced mood disorder; history of alcohol dependence and sedative abuse; and narcissistic personality traits by history. His current GAF was estimated at 45. (R. 624-25)

Nurse Watson saw Lindstrom for followup on November 21, 2006. (R. 612-17) He had begun having nasal congestion from taking 200 mg of quetiapine at bedtime and 100 mg in the morning, so he had divided his dosage into 100 mg three times a day. He was still experiencing irritability, but reported, "This is the most stable I have been in my whole life." (R. 613) He was eating better, losing weight, and feeling better about himself. He was sleeping better and had good energy, and his social anxiety with panic episodes had stopped. (Id.) He refused a prescription for lithium. His quetiapine was increased to 100 mg morning and noon, and 150 mg at bedtime "for mood stability and anger management[.]" (R. 617) His diagnoses were listed as Bipolar Disorder: Mixed; generalized anxiety disorder, panic; Cannabis abuse; "Sedative/Hypnotic-decreased"; rule out

substance-induced mood disorder; history of alcohol dependence and sedative abuse; and narcissistic personality traits, by history. His current GAF was estimated at 45. (R. 616-67) Lindstrom saw Kevin C. Massick, M.D. for followup on February 22, 2007. (R. 608-12; 617-20) He reported feeling well physically, but stated he had been feeling more anxious since his November visit, with muscle tension and palpitations. He stated he had stopped exercising, but noted that when he exercised regularly, he did not have anxiety feelings. He was continuing to abstain from using alcohol and other drugs, and was spending most of his time indoors. His compliance with the quetiapine dosage was good. He was urged to restart regular exercise "which has mood elevating and anxiety relieving properties," and he agreed to do so. (R. 612) His quetiapine was increased to 100 mg morning, noon, and evening, and 150 mg at bedtime. (*Id.*) His diagnoses were listed as Bipolar Disorder: Mixed; anxiety disorder not otherwise specified, rule out panic disorder; alcohol dependence in remission; cannabis abuse in early remission; antisocial personality disorder; and a history of narcissistic disorder. His current GAF was estimated to be 55. (R. 612)

Lindstrom saw Nurse Watson for followup on April 5, 2007. (R. 602-07) He reportedly felt "mellow" most of the time, and his energy level was lower since he had started on blood pressure medication. He had increased his quetiapine dosage at bedtime to help him sleep better. He stated he last used marijuana on October 25, 2006, when he smoked marijuana "to calm down" for three days when he was out of his medications. (R. 602-03) His diagnosis continued to be Bipolar Disorder: Mixed, generalized anxiety disorder, and panic. His quetiapine was continued without change, and he was directed to resume regular exercise. (R. 606)

Lindstrom returned for followup on July 10, 2007. (R. 595-602) He asked to try a different medication to help his energy level and relieve side effects. Although he stated he was "getting along better with [his] family," and his anxiety attacks were "way down," he stated his current medication

was making him forgetful. (R. 595) His quetiapine dosage was changed to 100 mg twice daily and 200 mg at bedtime, and notes indicate the possibility of a trial of BuSpar 10 mg twice daily for anxiety. (R. 600)

Lindstrom's next followup visit with Nurse Watson was on October 29, 2007. (R. 591-95) He complained of irritability, anxiety, and restless leg syndrome (akathisia). He was using a treadmill daily, and he reported improved motivation and energy. He stated he had been to a job interview, but he had a panic attack and did not get the job. He had unilaterally increased his quetiapine to 250 mg at bedtime, and decreased his daytime dosage. (R. 591) He was directed to take 100 mg of quetiapine twice daily and 200 mg at bedtime "for mood stability and anger management," and clonazepam .25 mg twice daily was added for anxiety and the restless leg syndrome. (R. 594-95)

Nurse Watson saw Lindstrom again on February 29, 2008. (R. 640-45) He reported having more stress due to his pending Social Security appeal, and his fear that he would become homeless. His mood, appetite, and sleep had been fluctuating due to his stress, and he reported having very low energy. (R. 640-41, 644) He was exhibiting anger management problems, and still experienced "[s]ocial anxiety with panic episodes up to several times a week - still trying to avoid triggers." (R. 644) The clonazepam had relieved his restless leg symptoms, and he was taking .5 mg at night instead of dividing the dosage into twice daily. He had stopped exercising due to stress and had no motivation for housework. (R. 641) His clonazepam was increased to .25 mg in the morning and .5 mg in the evening, and his quetiapine was continued without change. (Id.)

Lindstrom returned for followup on August 5, 2008. (R. 637-40) He was having tooth pain and could not afford dental care. His energy level and appetite were decreased, and his mood was "low." He reported occasionally taking extra doses of quetiapine. He stated he had not used marijuana or alcohol in 24 months. He was directed to continue taking

clonazepam .25 mg in the morning and .5 mg at bedtime for anxiety and restless leg syndrome. His quetiapine dosage was increased to 200 mg three times daily "for mood stability, paranoia and anger management." (R. 639)

Lindstrom was seen again on November 18, 2008. (R. 631-34) His sleep had improved and he was sleeping eight to nine hours a night. He felt he was distracted easily. He had gained five pounds since his last visit. His feelings of paranoia and anxiety were better controlled since the increase in his quetiapine, but his energy level was lower since the dosage increase. He planned to go to his sister's for Thanksgiving, although he still felt "nervous being around people at family gatherings." (R. 631) He was advised to keep a daily schedule, improve his social interactions, and get regular exercise. He was continued on clonazepam .25 mg in the morning and .5 mg at night. His quetiapine dosing schedule was changed to 200 mg in the morning and 400 mg at night. (R. 633)

On February 23, 2009, Lindstrom saw Dan L. Rogers, Ph.D. for "psychological evaluation of his cognitive functioning and his mental status as they represent his ability to engage and maintain employment[] [because] [t]here are particular questions about the role of alcohol or drug abuse in his present symptoms and the onset of severity of the symptoms." (R. 649) Dr. Rogers reviewed Lindstrom's medical records, including the previous neuropsychological evaluation. Lindstrom was cooperative and made a good effort on the tests. Among other things, Dr. Rogers noted Lindstrom has "suffered several major head injuries" during his life, including a skull fracture from a motorcycle accident at age 33 that required surgery, loss of consciousness in an automobile accident at age 34, and an incident when he was in the Navy where he "got into a fight with several other sailors in the barracks and they tied him to a bed and beat him," rendering him unconscious for most of the night. (R. 651) Dr. Rogers noted, "None of these injuries were mentioned in the medical records as far as I could ascertain. However, they would

surely have resulted in significant, permanent brain injuries." (*Id.*)

Regarding Lindstrom's mental status, Dr. Rogers observed him to have normal speech in rate and volume, but it was difficult to carry on a conversation with Lindstrom because he 'wandered.' (*Id.*) His "[t]houghts were tangential and circumstantial and his thoughts were not logically organized or goal directed. Associations were not appropriate." (*Id.*) He appeared to have poor insight and judgment. His mood was noted to be "mildly depressed," although Lindstrom "seemed to suppress it and he tried to maintain a happy façade." (*Id.*) Dr. Rogers noted:

> [Lindstrom] appeared to be of average intellect. He was oriented to place but not as well to time or person. Attention and concentration were both poor but vigilance was normal. Immediate retention was poor and he had problems with recollection of personal information and recent or remote facts. Thinking was very concrete and he did poorly with comprehending and expressing abstract concepts. He did not grasp humor, absurdity, or common proverbs. Mental calculations were done as well as most people and he did reasonably well with serial sevens.
>
> In the past he drank 6 or more beers each day in addition to a pint or more of liquor. He also used a variety of stimulants and opiates but he especially took illicit barbiturates. He quit using drugs and alcohol in 2003, he said, except that he has "slipped a few times," briefly, and used alcohol since then.

(R. 652)

Dr. Rogers administered several tests including the Wechsler Adult Intelligence Scale-IV, Controlled Oral Word Association Test, and Trail Making Test. On the WAISIII, Lindstrom scored in the average range for working memory, extremely low for processing speed, and low average for

verbal comprehension and perceptual reasoning. He obtained a Full Scale IQ of 80, which Dr. Rogers noted to be "in the low average range," and his processing speed was noted to be "in the retarded range." (*Id*.) Dr. Rogers noted individuals with a processing speed in that range "do not work very well under pressure and they are more vulnerable to pressure than most people." (*Id*.) In addition, "[o]n a task that requires thinking of words associated with specific letters he did very poorly, lower than 1 percentile. This indicates that his verbal fluency is very poor. He did well on a different task that assesses how well the individual is able to make simple judgments." (*Id*.)

Dr. Rogers reached the following conclusions regarding Lindstrom's mental capacity:

> John Lindstrom developed particularly severe symptoms in year 2003 or somewhat earlier. He has a history of alcohol and drug abuse but that is not the cause of his symptoms; on the contrary, he used alcohol and drugs in order to self medicate underlying feelings of tension, anxiety and depression, which may be related to a possible seizure disorder. The symptoms of overstimulation, loss of control, and aggressive behavior appear to be related to injuries to his brain and to other factors. The substance abuse may have contributed to the progress of his disease but he has been almost alcohol and drug free for over 6 years and yet his symptoms persist. His test results are not typical for alcoholic dementia.

> Psychological test results are consistent with the existence of organic brain impairment and the present results are similar to those obtained in an earlier neuropsychological evaluation. He probably has a generalized, moderate impairment of intellectual abilities, but in the area of processing speed and ability to

deal with pressures he appears to be functioning in only the retarded range. He seems to be easily over stimulated, a trait that is most often a result of organic brain impairment.

There really is not as much inconsistency in diagnoses as first appears to be the case. His presenting problems have usually centered around alcohol and drug abuse and behavior problems that could be explained by them. The same behaviors and symptoms are more parsimoniously and logically explained when his history of head injuries and spells are taken into account. Alcohol and drug abuse, and criminal history as well, appear to have been secondary to the other problems. He probably got into fights to reduce his level of stimulation rather than to dominate or hurt others.

He may not meet diagnostic criteria for antisocial personality. His behavior appeared to be a response to his need for self-medicating his feelings of anxiety and overstimulation rather than criminal behavior for its own sake.

He is able to remember and understand relatively simple instructions and locations. His pace is very poor and his attention and concentration . . . are inadequate; consequently he cannot carry out instructions. He is not able to interact appropriately with supervisors, coworkers, or the public. Judgment is poor and he is unable to adjust to changes in the work place.

[He] may not be able to manage cash benefits or his own finances.

(R. 652-53)

Dr. Rogers completed a Medical Source Assessment (Mental) (R. 655-57), in which he opined Lindstrom would have occasional difficulty understanding, remembering, and

carrying out short and simple instructions; maintaining regular attendance; being punctual within customary tolerances; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. He opined Lindstrom occasionally would be unable to remember locations and work-like procedures, carry out detailed instructions, sustain ordinary routine without special supervision, make simple work-related decisions, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting. He further opined Lindstrom frequently would be unable to understand and remember detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions form psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*)

Dr. Rogers noted Lindstrom "was polite and made very good effort, but he easily became overstimulated and displayed controlled anger. He would be unable to control anger in a work or social setting." (R. 657) He indicated Lindstrom's problems with being distracted easily and controlling his temper were not related to substance abuse and likely had been present since childhood. (R. 656)

2010 Report and Recommendation, pp. 14-22 (Docket no. 18, No. C09-3053-MWB).

### 3.    *Medical experts' testimony*

The court further adopts the medical testimony and summaries found in Judge Zoss's 2010 Report and Recommendation:

> In the prior Report and Recommendation, the court summarized the September 8, 2005, hearing testimony from Medical Expert (ME) Douglas Brady.    Brady reviewed Lindstrom's medical records, which he summarized as follows:
>
>> There's a diagnosis of substance induced mood disorder and it's pretty documented both in the VA, primarily through VA medical records. The claimant has had difficulty with alcohol and alcohol withdrawal.    He did have a neuropsychological evaluation, which in the most recent exhibit I have, . . . that was done on November 7, 2004, at the request of the VA because of this claimant's difficulty with these aggressive outbursts and also his difficulty, as he's mentioned, with his thinking and . . . ideas and so forth.    He has long term history of fighting.    He has had episodes of lost consciousness.  He's had episodes of significant electric shock. And he's had difficulty with these energy outbursts and so forth.    He has had delusional patterns.  The neuro psychologist felt they were primarily related to his substance abuse.  The neuropsychological results showed that the claimant has a pattern consistent with a mild dementia due to persisting alcohol use. And the neuro psychologist . . . felt that the claimant had adequate neuro . . . resources for being competent in vocational activity if his substance abuse was managed.  However, the claimant has had out of control substance abuse primarily alcohol.  (R. 412)

The court summarized the ME's testimony as follows:

> The ME stated Lindstrom's current mental health problems were caused by dependence on and abuse of alcohol and other drugs, and he opined that even if Lindstrom were to stop using completely, he likely still would have the mental problems because he has damaged his brain. (R. 413) In the ME's opinion, Lindstrom likely would meet or equal Listing 12.02, organic mental disorders, even if he stopped abusing substances. However, the ME indicated he lacked sufficient information to state that conclusion as a certainty. (R. 414-16)
>
> The ALJ indicated that because Lindstrom's mental impairments cannot be separated from his substance use or abuse, he would consider the substance use/abuse to be a contributing factor to Lindstrom's disabling condition. (See R. 416-18)

Doc. No. 11 in the prior case, pp. 12-13.

At the March 5, 2009, hearing in the present case, Dan Rogers, Ph.D. testified regarding his evaluation of Lindstrom, which was performed at the request of Lindstrom's attorney. (R. 661-70) Dr. Rogers noted he regularly performs consultative evaluations for Disability Determination Services, averaging around 100 evaluations a year for the last ten to fifteen years. (R. 662)

Dr. Rogers reviewed Lindstrom's medical records from 2003 forward. He met with Lindstrom and performed a number of psychological tests, including the Wechsler Adult Intelligence Scale, Fourth Revision; the Controlled Oral Word Association Test; the Trailmaking Test; and a mental status evaluation. He summarized his test results as follows:

> [Lindstrom] is able to remember and understand only relatively simple instructions and locations. He misunderstands instructions once they become more than very simple. His concentration and attention are inadequate. His pace is very poor and, consequently, he is not able to carry out instructions. He is not able to interact appropriately with other people including supervisors, co-workers, or the public, and his judgment is poor, and he is unable to adjust to changes in the workplace.

(R. 663) Lindstrom's processing speed on the WAIS-IV was noted to be "in the retarded range," falling in the bottom one percent. This led Dr. Rogers to conclude Lindstrom would operate at a slow pace one-third of the time. (R. 663-64) He further opined Lindstrom would have a difficult time with communication because of "a specific deficit in his word finding ability." (R. 669) He explained:

> Specifically, [Lindstrom] tends to misinterpret questions that are not in the way most people think of it, and if I could give you an example. I asked him how long he gets depressed for[,] a week or more, and his response was I get nervous and I don't want to be with friends, and when I repeated the question his response was I don't go shopping. But he never truly comprehended that question because it was more than just a very basic[,] simple question.

(Id.) Dr. Rogers stated his interview of Lindstrom was consistent with the test results. Lindstrom "consistently had difficulty communicating clearly what he wanted to say, and he had difficulty understanding and following [the doctor's] questions." (R. 670)

Dr. Rogers disagreed with other doctors that Lindstrom suffers from panic attacks. Instead, he diagnosed Lindstrom with "dementia due to head injuries, and . . . he has an impulse control disorder due to head injuries." (R. 664) He

also opined Lindstrom could have a partial complex-type seizure disorder, although he acknowledged that he was not qualified to diagnose that condition. (*Id*.) He based these conclusions on Lindstrom's report that his symptoms started in early childhood. He further noted, "In addition to that, on at least one occasion while he was in the VA Hospital, it appears that he was checked for his blood pressure and heart rate during one of these attacks and they were both normal, and that would be extremely unusual if it were actually an anxiety disorder."
(R. 665)

Dr. Rogers further opined that Lindstrom's dementia is not related to his history of using alcohol and other drugs. He explained this conclusion as follows:

> I've had extensive experience with treating and evaluating alcoholics such as in my years at the Mayo Clinic, and that and the literature indicate when the dementia is due to alcohol use the damage is generalized. All areas go down in a permanent fashion. In [Lindstrom's] case that's not so. It's only down in his processing speed, and word finding abilities just as they were when he was administered a neuropsychological evaluation a few years ago.

(*Id*.) He stated that in all other areas, Lindstrom is at or close to the normal range. (*Id*.)

Dr. Rogers explained what might appear to be discrepancies between his opinions and those of Dr. Dettmann, who administered the neuropsychological testing in November 2004. He stated Dr. Dettmann was evaluating Lindstrom in the context of providing treatment, "rather than looking at the sorts of issues that are considered in Social Security decisions." (R. 666) He noted Dr. Dettmann had not administered the full WAIS Intelligence Test, which would be "normal in a clinical evaluation in neuropsychology." (*Id*.) Dr. Rogers indicated the full test must be administered "to derive the sorts of scores that Social Security requests." (*Id*.)

He stated Dr. Dettmann's basic conclusions were similar to his own, but Dr. Dettmann was "answering different questions really." (*Id.*) Dr. Dettman also found Lindstrom's processing speed to be low. (R. 667) When Dr. Dettmann opined Lindstrom could work, Dr. Rogers stated this was "a conclusion rather than a [test] result, and he was responding as I said, I believe, to different questions. The basic conclusions are the same." (*Id.*)

Dr. Rogers stated that although Lindstrom "may obtain some symptomatic relief" from treatment, it was unlikely his "basic underlying symptoms could be relieved." (*Id.*) In considering when Lindstrom's condition would have worsened to the point that he was unable to work, Dr. Rogers indicated Lindstrom's symptoms "were clearly a serious problem in 2003 when he was hospitalized, and had to be moved to a different hospital because of the problems." (*Id.*)

Dr. Rogers acknowledged that Lindstrom's drinking and use of other drugs "certainly worsened" his symptoms, but do not explain his symptoms. He opined that "the most likely cause of the underlying [mental] deficit[s] were the three serious head injuries that he has received over the years, . . . probably 20 years ago." (R. 669-70) He further opined that by 2006, the onset date being considered by the ALJ, Lindstrom probably was functioning better than he was in 2003 because he apparently had abstained from alcohol and other drugs, and he was being monitored closely by his medical caregivers. (R. 668)

2010 Report and Recommendation, pp. 23-26 (Docket no. 18, No. C09-3053-MWB).

### 4. *Vocational expert's testimony*

The court will utilize Judge Zoss's summary of the Vocational Expert (VE) testimony from his 2008 Report and Recommendation, as follows:

At the August 15, 2006, hearing, VE Marian Jacobs identified Lindstrom's past relevant work as molding machine operator, unskilled, sedentary to light physical demand level

as Lindstrom performed the job; maintenance engineer, semiskilled, medium to heavy physical demands as Lindstrom performed the job; forklift operator, semi-skilled, light physical demand level as Lindstrom performed the job; small products assembler I, unskilled, light exertion level; heat treater II, semi-skilled, light to medium exertion level as Lindstrom performed the job; mixer operator, semi-skilled, light to medium exertion level as Lindstrom performed the job; hog sticker, semi-skilled, medium exertion level; and grinderchipper II, semi-skilled, heavy exertion level. (R. 197-98, 453-54)

The ALJ asked the VE hypothetical questions considering an individual who is fifty-three years old, with an eleventh grade education and a GED:

> The first one would limit work to simple, routine, more than simple, routine but not complex, semiskilled work, with frequent changes in a routine work setting and frequent independent decisions, occasional interaction with the public, frequent interaction with coworkers and supervisors, occasional exposure to hazards such as heights and moving parts. I'm concerned about side effects from his medication here. With this residual functional capacity, could the past relevant work be performed?

(R. 455) The VE indicated the hypothetical individual could perform Lindstrom's past work as a mixer operator, hog sticker, molding machine operator, chipper-grinder, small products assembler, and maintenance engineer. The VE indicated the jobs of forklift operator and heat treater would not be appropriate for the individual given the hazards involved in those jobs. (R. 455-56)

The ALJ posed a second hypothetical involving the same person, with "just occasional exposure to hazards and this would be simple, routine tasks with occasional changes in routine work setting and occasional independent decisions, no

interaction with the public and occasional interaction with coworkers and supervisors." (R. 456) With those restrictions, the ALJ opined none of Lindstrom's past relevant work could be performed. (*Id.*) The ALJ asked the VE to consider an individual of Lindstrom's age, education, and work experience, with "no physical demand limits other than the hazards." (R. 457) The VE indicated this individual could perform "some solitary jobs," including document preparer of microfilming materials, laundry folder, newspaper deliverer, and night stocker. (*Id.*)

The ALJ asked the VE to consider the same individual with occasional exposure to hazards; simple, routine tasks; no changes in routine work setting; no independent decisions; no interaction with the public; occasional interaction with coworkers and supervisors; and unable to sustain an eight-hour workday. The VE indicated this individual would be unable to work at full-time, competitive employment. (R. 458)

On questioning by Lindstrom's attorney, the VE indicated that if an individual had mental health problems that prevented him from completing tasks in a timely manner on an occasional basis up to one-third of the time, the individual would be unable to work. Further, if the individual had a weekly outburst or created some type of disturbance during his interactions with coworkers and supervisors, or if he was unable to have contact with the public, supervisors, and coworkers, he would be unable to work. Also, if the individual missed two or three days of work per month, he would be unable to work. (R. 460-61)

2008 Report and Recommendation, pp. 13-14 (Docket No. 11, No. C07-3050-MWB).

Furthermore, in Judge Zoss's 2010 Report and Recommendation, he found:

In the present case, VE Melinda Star was asked by the ALJ to consider "a 55 year old man with a twelfth grade education, and [Lindstrom's] past relevant work. . . .He has been diagnosed anti-social, depression, and a history of substance abuse. I'll also put anxiety with that depression."

33

(R. 674) The ALJ asked Lindstrom's attorney if this adequately described Lindstrom's "vocational or medical background," and the attorney noted, "Well, we also have the dementia diagnosis from Dr. Rogers." (*Id.*)

The ALJ then asked the VE to consider that the hypothetical individual had no physical limitations to speak of, but would be limited "to simple, routine repetitive work, and superficial contact with the public and a regular pace." (*Id.*) With those limitations, the VE stated the individual could work as a small products assembler at the light physical demand level, noting this is an unskilled position. She also opined the individual could work as an injection molding operator, also light and unskilled. She therefore opined this individual could perform all of Lindstrom's past unskilled work. (R. 674-75)

The ALJ asked the VE to consider the same individual, but to add that he could have no contact with the public, and he would have a slow pace for up to one-third of the day. The VE stated that with those additional limitations, the individual would be unemployable. (R. 675)

2010 Report and Recommendation, pp. 28-29 (Docket no. 18, No. C09-3053-MWB).

### 5. *The ALJ's decision*

Once again, the court adopts Judge Zoss's findings from his 2010 Report and Recommendation, as follows:

The ALJ found Lindstrom to be disabled due to "depression/anxiety, anti-social personality disorder, [and] a history of drug and alcohol abuse and dementia." (R. 470; see R. 470-74) He found Lindstrom likely would work at a slow pace for about one-third of the day, and he could not tolerate any contact with the public. With these limitations, the ALJ concluded Lindstrom could not return to any of his past relevant work, nor could he perform any other jobs that exist in significant numbers in the national economy. (R. 472-74)

However, the ALJ further found that if Lindstrom "stopped the substance use, [he] would have the residual

functional capacity to perform a full range of work at all
exertional levels but with the following nonexertional
limitations: the ability to perform only simple, routine,
repetitive work involving occasional, superficial contact with
the general public and performed at a regular pace." (R. 475)
He therefore found that Lindstrom's "substance use disorder[]
is a contributing factor material to the determination of
disability," and therefore, Lindstrom "has not been disabled
within the meaning of the Social Security Act at any time from
the alleged onset date through December 31, 2007, the date on
which he last met the disability insured status requirements of
Title II of the [Social Security] Act." (R. 476-77) In making
this finding, the ALJ gave significant weight to opinion of
Carole Kazmierski, Ph.D., who conducted a paper review of
the Record on January 20, 2004. See R. 472 (citing Ex. 3F,
which appears at R. 216-29) Dr. Kazmierski concluded that
Lindstrom's mood disorder was "alcohol induced." (R. 219)
The ALJ noted that Lindstrom's "ability to play cards, use
public transportation and obtain medical care indicate[] that he
has the capacity to carry out simple tasks." (R. 472)

The ALJ found Dr. Rogers's conclusions to be contrary
to "the opinions of the health care professionals working with
the Department of Veterans Affairs and with the Disability
Determination Services of Iowa," noting Dr. Rogers's
opinions were contradicted by Lindstrom's reports to doctors
about his activities, "such as visiting his sister," and his ability
to "cooperate with the various health care professionals who
have treated or examined him." (R. 473) The ALJ further
found that Dr. Rogers's opinions "are contradicted by the
opinions of the State agency medical reviewers and by the
opinions of the people [who] have treated [Lindstrom] over the
long term." (Id.)

2010 Report and Recommendation, pp. 29-30 (Docket no. 18, No. C09-3053-MWB).

Upon review of the record, and absent any objections to Judge Zoss's factual
findings, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any

more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask."). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995),

and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that

'[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate

in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[1]

_____

[1] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."' (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See*, e.g., *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation

(continued...)

Lindstrom has objected to Judge Zoss's 2010 Report and Recommendation advising remand for further development of the record. Lindstrom argues that the evidence is clear that his drug addiction and alcoholism have not been material factors contributing to his disability, and, therefore, any further development would be superfluous (Docket no. 19, No. C09-3053-MWB). Although the court reviews this finding, *de novo*, and Judge Zoss's other findings for clear error, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); see also *Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

----

[1](...continued)
omitted)).

## III.  LEGAL ANALYSIS

### A.  Lindstrom's Objection

Lindstrom objects to Judge Zoss's finding that the record does not overwhelmingly support an immediate finding of disability.  Lindstrom argues the evidence is clear that his drug addiction and alcoholism have not been material factors contributing to his disability and that remand would simply further delay the receipt of benefits to which he is entitled.  Plaintiff's Objections To The Magistrate Judge's Report and Recommendation, (Docket no. 19, No. C09-3053-MWB).  This evidence, Lindstrom alleges, includes testimony from Dr. Dan Rogers.  *Id.* at 3.  Dr. Rogers examined Lindstrom in February 2009, reviewed his medical records, and administered various tests.  As a result of his analysis, Dr. Rogers concluded Lindstrom's ability to function "do[es] not include limitations associated with the claimant drinking or using drugs." *Id.*  Furthermore, Dr. Rogers pointed out that Lindstrom stopped using alcohol and drugs in 2003, although he did relapse on occasion. *Id.*  Lindstrom also relies on testimony from Dr. Douglas Brady.  Although Dr. Brady never examined Lindstrom, Dr. Brady nevertheless testified at Lindstrom's September 2005 hearing.  Lindstrom points out that at the hearing, Dr. Brady "testified that the claimant's psychiatric limitations were so intertwined with his substance abuse, that the two could not be separated." *Id.* at 4.  Dr. Brady's testimony, Lindstrom argues, should have been considered by the ALJ in reaching his decision.  *Id.*

Lindstrom also alleges that the medical evidence establishing substance abuse between August 2003 to March 2009 is "sparse" *Id.*  Any substance abuse before August 2003, Lindstrom claims, was self-medication so that he could work, and "may have increased the claimant's ability to work." *Id.*  Lindstrom argues that the "limited use of marijuana and alcohol after August 2003 is insufficient to support a finding that drug abuse or alcoholism was a material factor contributing to [his] disability." *Id.*

Additionally, Lindstrom claims that the consultants the ALJ relied upon in reaching his decision were non-examining psychological consultants, who only reviewed six months of records (August 2003 - February 2004). Because these opinions are not based upon any evidence between March 2004 until the hearing in March 2009, Lindstrom argues that these consultants are incompetent to comment on his abilities or substance abuse from March 2004 until the hearing in March 2009. *Id.* Lindstrom also points out that in Judge Zoss's Report and Recommendation, Judge Zoss found that the consultants' opinions did not constitute "substantial evidence" in 2008, and therefore should not constitute as "substantial evidence" now. *Id.* at 5; (AR 511; see AR 501).

Because of these reasons, Lindstrom argues that the factual issues have been fully developed and remand would merely delay the receipt of benefits to which he is entitled. Lindstrom urges that the record overwhelmingly supports a disability finding, based upon Dr. Rogers's testimony that he would need to work at a slow pace at least one-third of the workday, and the vocational experts' testimony verifying that he would be unable to maintain competitive employment. *Id.* at 5.

## B. Discussion

The court will first look at the testimonies of Dr. Rogers and Dr. Brady to determine if such evidence in light of the record "overwhelmingly supports" an immediate finding of disability. *Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir. 1989); *see Peterman v. Chater*, 946 F. Supp. 734, 741 (N.D. Iowa 1996). Dr. Rogers examined Lindstrom on February 23, 2009, for "psychological evaluation of his cognitive functioning and his mental status as they represent his ability to engage and maintain employment[] [because] [t]here are particular questions about the role of alcohol or drug abuse in his present symptoms and the onset of severity of the symptoms." (R. 649) Dr. Rogers reviewed Lindstrom's medical records and administered several tests, including the Wechsler Adult

Intelligence Scale-IV, Controlled Oral Word Association Test, Trail Making Test, and completed a Medical Source Assessment (Mental). (R. 655-57) After examination, Dr. Rogers opined Lindstrom's adverse behavior was not a result of his history of alcohol and drug abuse, but rather because of significant, permanent brain injuries caused by head trauma. Dr. Rogers discovered that Lindstrom "suffered several major head injuries" during his mid-life, involving a skull fracture from a motorcycle accident when he was age thirty-three, loss of consciousness in a separate automobile accident at age thirty-four, and a fight which left him unconscious while Lindstrom was serving in the Navy. (R. 651) Dr. Rogers diagnosed Lindstrom's problems with alcohol, drug abuse, and criminal behavior as a result of his underlying brain injuries caused by head trauma. (R. 652-53) Because of these injuries, Dr. Rogers concluded Lindstrom "would be unable to understand and remember detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes." 2010 Report and Recommendation, p. 22 (Docket no. 18, No. C09-3053-MWB).

Furthermore, Dr. Douglas Brady testified at the September 8, 2005 hearing that Lindstrom has damaged his brain because of his past dependance on and abuse of alcohol and other drugs and will continue to have mental problems because of this previous abuse. (R. 413) Dr. Brady believed that even if Lindstrom completely stopped his alcohol and drug usage, he would still meet or equal Listing 12.02, organic mental disorders.

44

However, Dr. Brady admitted that he was basing this conclusion on insufficient information, and could not state it with absolute certainty. (R. 414-16)

I may enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding. *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992); *see Fowler*, 866 F.2d at 253; *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir. 1987). Lindstrom's strongest argument, and one remarkably not mentioned by any other physician that has examined Lindstrom, is that offered by Dr. Rogers. Dr. Rogers suggests that Lindstrom's alcoholism, drug dependance, and prior criminal behavior are a result of brain damage caused by several major head injuries. However, the court notes that these head injuries occurred while Lindstrom was in his early thirties, and do not account for Lindstrom's childhood alcoholism and deviant behavior beforehand. (R. 299-304) Furthermore, Dr. Brady's testimony does not overwhelmingly support an immediate finding of disability, because he admits that he is basing his conclusions on insufficient information and cannot state with absolute certainty whether Lindstrom would qualify under Listing 12.02, organic mental disorders, if he completely stopped his alcohol and drug usage.

Lindstrom next argues that the "limited use of marijuana and alcohol after August 2003 is insufficient to support a finding that drug abuse or alcoholism was a material factor contributing to [his] disability." (Docket no. 19, p. 4) Conversely, the court notes that Lindstrom had been daily consuming alcohol up until five months prior to the August 15, 2006 hearing, and smoking marijuana every day up until one month prior to that hearing. (R. 438-39) On July 18, 2006, Lindstrom indicated to Sally Watson, A.R.N.P. at the VA Medical Center in Des Moines, that he had been daily "self-medicating" with marijuana for the previous eighteen months. (R. 625-26) The court finds that medical evidence

establishing substance abuse between August 2003 to March 2009 is not as "sparse" as Lindstrom would like to portray.

Finally, Dr. Rogers's and Dr. Brady's testimony must be juxtaposed with the findings of other consultants who have evaluated Lindstrom. For instance, on September 15, 2003, Lindstrom was examined by David L. Bethel, D.O., who determined after a psychiatric consultation that Lindstrom's examination was within normal limits. (R. 301-02) On November 10, 2003, after treatment of alcohol dependence at the VA medical center, Lindstrom was noted to have satisfactorily completed his overall treatment plan and medication regimen, and his mental status examination was within normal limits in all criteria. (R. 290-91) On January 20, 2004, DDS consultant Carole Davis Kazmierski, Ph.D. reviewed Lindstrom's record and conducted two Mental Residential Functional Capacity Assessment forms. Dr. Kazmierski concluded that Lindstrom "showed problems with anger control, but other aspects of mental status functioning were generally within normal limits." (R.211) Dr. Kazmierski also found that Lindstrom was able to tolerate "brief, superficial dealings with others when it is in his own interests to do so," and "[o]ther aspects of work-related functioning do not appear to be significantly impaired when [he] is sober and abstinent." (R.211) Two other medical consultants, on separate occasions (March 1, 2004 and March 30, 2004), reviewed Lindstrom's record and concurred with Dr. Kazmierski's findings.

On June 4, 2004, a social worker with a VA program for homeless veterans assisted Lindstrom in finding housing in Webster City, Iowa. The social worker remarked that Lindstrom "displayed positive social skills and interacted well with individuals within the community." (R. 368) On November 7, 2004, Dr. David F. Dettmann, Ph.D., Neuropsychologist, conducted an eight hour examination of Lindstrom. Dr. Dettman

concluded that Lindstrom was cooperative, chatty, appropriately groomed, and displayed a normal rate of mentation. As Dr. Dettman explained,

> Present neuropsychological data is consistent with a mild dementia due to persisting alcohol abuse. The difficulties noted in visual memory and learning, visual perception and visual constructional abilities, as well as in his reduced ability for visual construction and initial immediate detailed verbal memory, as well as reduced ability in understanding logical sequences of behavior, are consistent with the documented substance abuse.

(R. 357)

These findings, conducted by independent physicians and consultants, indicate that Lindstrom is not disabled apart from his substance and alcohol abuse and are in contravention to Dr. Brady's and Dr. Rogers's testimony. Thus, after conducting a review of the record *de novo*, I find that while there may be some evidence that Lindstrom suffers from a physical or mental disability that prevents his ability to find gainful employment, such evidence is not so overwhelming to support an immediate award of disability benefits.

## C. *Report and Recommendation*

In Judge Zoss's 2010 Report and Recommendation (Docket no. 18, No. C09-3053-MWB), he found that the ALJ failed to comply with the court's 2008 Order Regarding Magistrate Judge's Report and Recommendation (Docket no. 12, No. C07-3050-MWB) in three respects. First, the ALJ failed to obtain a comprehensive consultative psychological evaluation to support his RFC determination. Second, the ALJ failed to obtain and properly consider the VA's disability determination. Third, the ALJ failed to fully explain his credibility assessment to "assure reviewing courts that it was not formed 'solely on the basis of personal observations.'" *Id.* at 9. No party disputes that these issues were not addressed by the ALJ as previously directed by the court. Thus, for the

reasons stated by Judge Zoss — in addition to the rationale proffered in the court's 2008 Order Regarding Magistrate Judge's Report and Recommendation (Docket no. 12, No. C07-3050-MWB) — the court accepts Judge Zoss's 2010 Report and Recommendation and remands this case pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration and to address the court's previous three concerns which still remain.

## IV. CONCLUSION

For the foregoing reasons, the court finds that the record does not overwhelmingly support an immediate finding of disability and accepts Judge Zoss's 2010 Report and Recommendation. Once again, "the proper remedy is remand to allow the Commissioner to correct the deficiencies in the ALJ's decision." (Docket no. 12, C07-3050-MWB) The Commissioner's decision is reversed and this case is **remanded** for further development of the record, to obtain sufficient evidence, and to conduct a proper credibility analysis of Lindstrom's statements.

**IT IS SO ORDERED.**

**DATED** this 28th day of March, 2011.

Mark W. Bennett
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA